**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON**

**CIVIL ACTION NO. 24-94-DLB-CJS**

**EDGAR T. RAGOUZIS**                                                          **PLAINTIFF**


**v.**                          **MEMORANDUM OPINION AND ORDER**


**RICHARD O. HAMILTON, JR., et al.**                              **DEFENDANTS**

\* \*   \* \*   \* \*   \* \*   \* \*   \* \*   \* \*

This case comes before the Court on three separate motions: a Motion for Summary Judgment filed by Defendant Richard O. Hamilton, Jr. (Doc. # 55), as well as a Motion for Leave to file a Memorandum in Opposition to Hamilton's Motion for Summary Judgment (Doc. # 63) and a Motion for Leave to file a Sur-Reply (Doc. # 64) filed by Plaintiff Edgar T. Ragouzis. All three Motions are ripe for the Court's review. For the reasons that follow, Ragouzis's Motion for Leave to file a Memorandum in Opposition (Doc. # 63) and Motion for Leave to file a Sur-Reply (Doc. # 64) are **denied**, and Hamilton's Motion for Summary Judgment (Doc. # 55) is **granted.**

I.      **FACTUAL AND PROCEDURAL BACKGROUND**[1]

Since 1995, Edgar Ragouzis has owned two condominium units at The Madison House, a 175-unit high-rise in Cincinnati, Ohio. (Doc. # 55-3 at 185-86). In 2018, after experiencing some water intrusion on one of his balconies, Ragouzis filed a *pro se* action

---

[1]      The following factual summary is derived from Hamilton's Motion for Summary Judgment (Doc. # 55) and the evidence attached thereto. As discussed *infra*, Ragouzis failed to file a timely response to this Motion (Doc. # 55), and the Court denied his untimely Motion for an Extension of Time to Respond. (*See* Doc. # 60).

1

for damages against the Madison House Condominium Owners' Association, Inc. (the "Association").  (*Id.* at 186).  The Association performed restorative work to mitigate the issue, and Ragouzis agreed to release claims related to water intrusion issues that occurred prior to November 18, 2018 in exchange for $21,803.  (*Id.*).  Ragouzis signed a written release memorializing this agreement on that same date.  (*Id.* at 187).

However, this episode proved only the first skirmish in Ragouzis's legal battle with the Association.  In January of 2020, the Association filed two foreclosure actions against Ragouzis in the Hamilton County Court of Common Pleas, alleging that Ragouzis had failed to pay various fees and assessments as required under his condominium ownership agreement (the "Little Cases").  (*Id.* at 69-73).  Ragouzis counterclaimed, arguing that the Association had failed to adequately repair water damage in violation of the same agreement.  (*Id.* at 126-28).  In August of 2022, Ragouzis retained Richard Hamilton and the law firm of Robbins, Kelly, Patterson, and Tucker ("RKPT") to replace his original counsel in the Little Cases.  (Doc. # 55-1 at 68:4-69:22).[2]  Ragouzis, with Hamilton's assistance as counsel, unsuccessfully moved for a temporary restraining order prohibiting the Association's contractors from performing remediation related to the water damage in Ragouzis's units absent the supervision of an independent engineer.  (Doc. # 55-3 at 147-155).

Ragouzis's qualms with the Association were not limited to water damage in his own units.  As the Little Cases proceeded, Ragouzis set his sights on recruiting other condominium owners at The Madison House to join him in a new lawsuit against the

---

[2]      Hamilton has submitted excerpts from two depositions—one of himself and one of Ragouzis.  (*See* Docs. # 55-1 and 55-2).  When referring to these depositions, the Court will cite the transcript's internal pagination.

2

Association related to unrepaired damage to other units and common areas.  (Doc. # 55-4 ¶ 5).  To that end, in November of 2022, Ragouzis met with Hamilton and attorney Bertha Helmick, who also owned a condominium at The Madison House.  (Doc. # 55-5 ¶ 10).  After the three discussed potential claims against the Association, Hamilton informed Ragouzis that the legal fees for such a lawsuit would be significant.  (Doc. # 55-1 at 50:7-13).  Ragouzis assured Hamilton that he had "millions of dollars" and could cover all legal fees—an assessment which Helmick endorsed.  (*Id.* at 49:23-50:13).  Furthermore, Ragouzis stated that he had been involved in many lawsuits and knew what to expect.  (Doc. # 55-5 ¶ 10).  On November 21, 2022, Hamilton filed a twenty-two-count complaint against the Association and several other defendants in the Hamilton County Court of Common Pleas on behalf of Ragouzis, Helmick, and five other condominium owners (the "Condominium Lawsuit").  (*See* Doc. # 55-3 at 215-342).  The Condominium Lawsuit also named more than 100 other condominium owners at The Madison House as "interested party defendants".  (*Id.*).

During the course of the Condominium Lawsuit, the Association moved to disqualify Hamilton and RKPT.  (*Id.* at 573-85).  The Association's motion to disqualify was based on Hamilton's representation of Steven Oyster, who had previously served as an officer on the Association's Board.  (*Id.* at 574-75).  The Association served Oyster with a subpoena in the Condominium Lawsuit seeking records from Oyster's time on the Association's Board.  (Doc. # 55-1 at 88:2-5).  Hamilton and RKPT represented Oyster regarding the Association's subpoena.  (*Id.*).  The Association claimed that, through their representation of Oyster, Hamilton and RKPT obtained confidential and privileged Association records which bore directly on the claims asserted by Ragouzis and the other

plaintiffs in the Condominium Lawsuit.  (Doc. # 55-3 at 584).  Hamilton advised Ragouzis that RKPT could withdraw in response to the Association's motion to disqualify and help find replacement counsel or, alternatively, they could contest the motion.  (Doc. # 55-1 at 93:9-24).  Ragouzis stated that he believed the Association was attempting to delay proceedings and directed Hamilton and RKPT to fight the motion to disqualify.  (Doc. # 55-4 ¶ 8).  Hamilton responded to the motion to disqualify and the court held a two-day hearing on the matter, but it never ruled on the motion while Hamilton and RKPT remained as counsel.  (Doc. # 55-1 at 95:12-19).

Meanwhile, in the Little Cases, the Association moved for summary judgment on Ragouzis's counterclaim, arguing that the written release he signed on November 18, 2018 barred his claim.  (Doc. # 55-3 at 160).  On September 25, 2023, the court adopted a magistrate's recommendation granting the Association's motion and dismissing Ragouzis's counterclaim.  (*Id.* at 197-203).  The court noted that Ragouzis had signed a release which constituted "an absolute bar" to claims arising from water intrusion onto his balconies prior to the release's execution.  (*Id.* at 202).

As 2023 wound to a close, support for the Condominium Lawsuit began to falter. Although Hamilton and RKPT continued to issue individual written demands to the Association on behalf of each plaintiff, several plaintiffs announced their intention to exit the case.   (Doc. # 55-4 ¶¶ 10-12; Doc. # 55-1 at 111:7-21).   To address these developments, Hamilton organized a meeting on January 10, 2024 at RKPT's offices in Cincinnati.  (Doc. # 55-1 at 111:3-21).  Several of the Condominium Lawsuit plaintiffs were present at this meeting, along with Hamilton and two other RKPT attorneys—Cory Britt and Zachary Schaengold.  (Doc. # 55-5 ¶ 13).  Hamilton informed the gathered clients

4

that if some of the plaintiffs withdrew their claims, they would become interested party defendants in the Condominium Lawsuit, which would create a conflict of interest that would preclude RKPT's further participation in the case. (Doc. # 55-1 at 113:3-19). Hamilton also informed the group that Ragouzis had been sending threatening and derisive emails to Hamilton and other RKPT staff members, accusing them of malpractice. (Doc. # 55-5 ¶¶ 14-16). Hamilton displayed two such emails on a projector. (Doc. # 55-2 at 158:23-25). In one of these emails—sent from Ragouzis to Hamilton, Schaengold, and Britt—Ragouzis asked:

> Did Rick [Hamilton] double dip. Is that ethical if Rick did so? Is Rick in violation of the Ohio Civil Rules of Professional Ethical Conduct. I have no answer at this time but I have a clue and will investigate further if this damn thing is not resolved soon.

(Doc. # 55-3 at 725). In other emails, Ragouzis accused Hamilton of misleading the Condominium Lawsuit plaintiffs and breaching the duty he owed Ragouzis and the other plaintiffs. (*Id.* at 715-16; 730). Hamilton asked Ragouzis to explain the basis for his allegations, but Ragouzis refused to answer. (Doc. # 55-1 at 116:2-14). Hamilton also informed the group that Ragouzis had stopped paying RKPT's legal fees. (Doc. # 55-5 ¶ 14). The other Condominium Lawsuit plaintiffs indicated that they were upset by Ragouzis's behavior and that they wished for RKPT to continue representing the group in the hopes of reaching a settlement. (*Id.* ¶¶ 15-17). When one of the plaintiffs asked what it would take for RKPT to continue its representation, Hamilton stated that if Ragouzis agreed to release his threatened claims and resume paying legal fees as promised, RKPT would engage in a last-ditch effort to reach a settlement with the Association. (*Id.* ¶ 18). Ragouzis stated that he did not have any claims against Hamilton or RKPT and he agreed to resume paying legal fees. (*Id.* ¶¶ 19-20). However, Hamilton

5

insisted that Ragouzis seek independent counsel to prepare a written agreement reflecting this release and advise him of its effects. (Doc. # 55-2 at 162:10-23). Ragouzis agreed to do so by 5:30 p.m. the following day. (Doc. # 55-5 ¶ 20).

However, rather than seeking an independent attorney as Hamilton suggested, Ragouzis asked Bertha Helmick to prepare a written release. (*Id.* ¶ 21). At first, Helmick rebuffed this request and recommended that Ragouzis consult another attorney who was not involved with the case. (*Id.* ¶ 22). However, when Ragouzis claimed that there was "no other lawyer available[,]" Helmick reluctantly agreed to draft a written release (the "Release").[3] (*Id.* ¶ 24). The Release states, in pertinent part:

> 1.    I am the Affiant herein and am of sound mind and memory.
>
> 2.    On Tuesday January 10, 2024 I have already orally admitted in front of the three attorneys on our case, Rick Hamilton, Cory D. Britt, and Zachary Schaengold, and fellow Plaintiffs Larry Donald, Marsha Buelterman, Don Daniel, Ann Juergens, Bertha Helmick, and Rebecca Bolce by Zoom, that I do not have any claim of any nature against them or their firm to date.
>
> 3.    Having been appropriately counseled on the subject, I state unequivocally in this Affidavit that I have no claim against Rick Hamilton and/or any attorney in the firm of Robbins Kelly Patterson and Tucker through the date that I sign this document.
>
> 4.    To the extent that any claim, either of an ethical or malpractice nature may have existed as of this date, I knowingly and voluntarily forever release any claim.
>
> 5.    Further Affiant sayeth naught.

---

[3]    In Ragouzis's deposition, he testified that Helmick drafted the Release before he reviewed it and affixed his signature. (Doc. # 55-2 at 162:24-163:22). However, Helmick, in an affidavit submitted with Hamilton's Motion, states that she merely "typed up what Edgar dictated, which was what he had orally agreed to in the meeting the prior day[.]" (Doc. # 55-5 ¶ 24). Thus, it remains unclear whether Ragouzis composed the language of the Release himself.

(*Id.*, Ex. C-2).  Although Helmick agreed to draft the Release, she refused to advise Ragouzis of its effects.  (*Id.* ¶ 24).  Helmick and Ragouzis then visited another lawyer, Kelly Farrish, who agreed to notarize the Release.  (*Id.* ¶ 25).  However, Farrish also refused to advise Ragouzis on the Release.  (*Id.*).  Ragouzis testified to these facts at his deposition and confirmed that he signed the Release.  (Doc. # 55-2 at 161:7-163:3).

On the evening of January 11, 2024, Ragouzis delivered the Release to Hamilton via email and implored him to "GET THE SETTLEMENT DONE."  (Doc. # 55-3 at 738 (emphasis in original)).  Hamilton and RKPT proceeded to negotiate for several weeks until the Association cut off all settlement negotiations in February 2024.  (Doc. # 55-1 at 114:2-20).  On February 22, 2024, Hamilton and RKPT moved to withdraw as counsel in the Condominium Lawsuit, citing divergent client interests among the plaintiffs, a breakdown in the attorney/client relationship, and the plaintiffs' failure to meet their financial obligations.  (Doc. # 55-3 at 744-45).  In their Motion to Withdraw, Hamilton and RKPT noted that they had refrained from filing such a motion pursuant to an agreement with the Condominium Lawsuit plaintiffs.  (*Id.*).  Specifically, the Condominium Lawsuit plaintiffs had a "clear understanding that if [Hamilton and RKPT were] not able to settle [the Condominium Lawsuit] with the primary defendants and substantially resolve the case, then [Hamilton and RKPT] would seek leave of the Court to withdraw."  (*Id.*).  On February 28, 2024, the court granted Hamilton and RKPT's Motion to Withdraw after a hearing.  (*Id.* at 793).

Ragouzis filed the Complaint in this case on June 3, 2024, invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332.  (Doc. # 1).  The Complaint asserts two causes of action against Hamilton and other unnamed defendants: breach of contract and

7

professional negligence.  (*Id.* ¶¶ 30-42).  Hamilton moved for judgment on the pleadings on September 12, 2024.  (Doc. # 16).  Among other points, Hamilton argued that the Release barred Ragouzis's claims.  (*Id.* at 10-11).  On February 9, 2025, the Court denied Hamilton's Motion.  (Doc. # 34).  In its Memorandum Opinion and Order, the Court noted that Ragouzis's Complaint "does not clearly show that his claims are barred" by the Release.  (*Id.* at 9).  Accordingly, the Court held, "it would be inappropriate to grant Hamilton's MJOP based on his waiver argument at this juncture."  (*Id.* at 10).

On December 30, 2025 Hamilton filed the instant Motion for Summary Judgment. (Doc. # 55).  Hamilton's Motion argues that "[b]ecause Ragouzis knowingly and voluntarily released the claims asserted in this lawsuit, his claims against Hamilton should be dismissed."  (*Id.* at 3).  Under the Local Rules, Ragouzis's responsive deadline was January 20, 2026.  LR 7.1(c).  Ragouzis failed to file a response, and, on January 27, 2026, the Court ordered him to show cause why his claims should not be dismissed for failure to prosecute or failure to comply with the Local Rules.  (Doc. # 56).  Ragouzis responded to the Court's Show Cause Order (*Id.*) on February 3, 2026, stating that his counsel had previously drafted a motion for an extension of time to respond to Hamilton's Motion for Summary Judgment, but failed to file it with the Court.  (Doc. # 57 at 1-2).  In the final sentence of his response to the Court's Show Cause Order, Ragouzis requested an extension of time to respond to Hamilton's Motion for Summary Judgment.  (*Id.*).  The Court denied Ragouzis's request for an extension on February 10, 2026.  (Doc. # 60). Despite the Court's Order (Doc. # 60), Ragouzis filed a Response to Hamilton's Motion for Summary Judgment on February 13, 2026.  (Doc. # 61).  Hamilton filed a precautionary Reply (Doc. # 62), in which he urges the Court to ignore or strike Ragouzis's

8

Response.  Subsequently, on March 3, 2026, Ragouzis filed a Motion for Leave to File a Memorandum in Opposition to Hamilton's Motion for Summary Judgment.  (Doc. # 63).  On the same day, Ragouzis moved for leave to file a sur-reply (Doc. # 64) to Hamilton's Reply (Doc. # 62).[4]  On March 17, 2026, Hamilton responded to Ragouzis's Motion for Leave to File a Sur-Reply, reiterating that he "only filed his Reply in Support of Motion for Summary Judgment (Doc. # 62) out of an abundance of caution after Plaintiff ignored the Court's earlier Memorandum Order."  (Doc. # 66 at 1).  Ragouzis filed a Reply to Hamilton's Response on March 24, 2026.  (Doc. # 67).

Accordingly, three motions are presently before the Court: Hamilton's Motion for Summary Judgment (Doc. # 55), Ragouzis's Motion for Leave to File a Memorandum in Opposition (Doc. # 63), and Ragouzis's Motion for Leave to File a Sur-Reply (Doc. # 64).  The Court will first address Ragouzis's Motions for Leave (Docs. # 63 and 64).  Each will be addressed seriatim.

## II.    RAGOUZIS'S MOTIONS FOR LEAVE

### A.    Motion for Leave to File a Memorandum in Opposition

Ragouzis has submitted a "Motion for Leave to File a Memorandum in Opposition to Plaintiff's Motion for Summary Judgment with Supplemental Evidence."  (Doc. # 63).  In his Motion, Ragouzis seeks an extension of time to file a response in opposition to Hamilton's Motion for Summary Judgment (Doc. # 55), filed on December 30, 2025.  (Doc. # 63 at 1).  However, as discussed above, Ragouzis previously sought an extension of time to file a response to Hamilton's Motion for Summary Judgment (Doc. # 55) under Rule 6(b).  (*See* Doc. # 58).  The Court denied Ragouzis's Motion on February 10, 2026,

---

[4]    Ragouzis also filed a Sur-Reply without leave of the Court on the same day he filed his Motion for Leave to file a Sur-Reply.  (Doc. # 65).

finding that he had failed to establish excusable neglect.  (Doc. # 60).  In its Order, the Court emphasized the fact that Ragouzis had previously failed to comply with this Court's briefing deadlines, prompting a warning that future failures could result in dismissal.  (*Id.* at 7-8).  Similarly, the Court found that Ragouzis had failed to demonstrate that his most recent failure to timely respond to a dispositive motion resulted from circumstances beyond his control.  (*Id.* at 7).  Concluding that Ragouzis had not established excusable neglect, the Court denied Ragouzis's Motion (Doc. # 58) and held that it would rule on Hamilton's Motion for Summary Judgment in a subsequent order.  (*Id.*).  Undeterred by the Court's Order (Doc. # 60), Ragouzis filed a Response in Opposition to Hamilton's Motion for Summary Judgment (Doc. # 61) on February 13, 2026.  This Response (Doc. # 61) was filed without leave nearly one month after Ragouzis's deadline had passed.  Hamilton filed a Reply to Ragouzis's Response (Doc. # 61) only "out of an abundance of caution" on February 27, 2026.  (Doc. # 62 at 1 n. 1).  On March 3, 2026 Ragouzis filed the instant Motion for Leave to file a Response in Opposition, arguing that "newly available medical documentation" warrants reconsideration of the Court's prior Order denying an extension of time to respond.  (Doc. # 63 at 2).

The procedural basis for Ragouzis's Motion (Doc. # 63) is somewhat opaque.  As discussed above, the Court has already denied Ragouzis's request for an extension of time to file a response under Rule 6(b).  (Doc. # 60).  Ragouzis's most recent Motion seeks reconsideration under Rule 60(b).  (Doc. # 63 at 3).  Indeed, he asserts that "Fed. R. Civ. P. 60(b) allows a district court to vacate a final judgment for the following reasons: '(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence could not have been discovered in time to move for a new

10

trial under Rule 59(b); (3) fraud . . . .'"  (Doc. # 63 at 3 (quoting *King v. United States*, 143 F.4th 705, 710 (6th Cir. 2025)).  Ragouzis suggests that, at the time the Court issued its prior ruling on February 10, 2026, it did not "have the benefit of the comprehensive medical documentation" Ragouzis now submits in conjunction with his Motion.  (*Id.* at 4).  Thus, it seems that Ragouzis seeks reconsideration of the Court's prior Order due to the "newly discovered evidence" carveout established by Rule 60(b).

However, Rule 60(b) only applies to "final judgment[s], order[s], or proceeding[s.]" Fed. R. Civ. P. 60(b); *see also Payne v. Courier-Journal*, 193 F. App'x 397, 400 (6th Cir. 2006) ("Rule 60(b) applies only to 'final' orders.") (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1277 (6th Cir. 1991)).  The Court's February 10, 2026 Order denying Ragouzis's request for an extension under Rule 6(b) was not a final order, judgment, or proceeding.  *See Jaeger v. Wainwright*, No. 1:19-cv-2853, 2020 WL 13830390, at *2 (N.D. Ohio Apr. 28, 2020) (holding that an order granting a motion for extension of time was not subject to Rule 60(b)).  Thus, Rule 60(b) provides no basis for reconsideration of the Court's February 10, 2026 Order (Doc. # 60).

Still, "[d]istrict courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of final judgment." *Mallory*, 922 F.2d at 1277 (citing *Marconi Wireless Telegraph Co. v. United States*, 320 U.S. 1, 47-48 (1943)).  The Sixth Circuit has held that district courts may treat a motion to reconsider a non-final order under Rule 60(b) as a motion under Rule 54(b), which contemplates such reconsideration.  *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2006) ("District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of the case before entry of final

judgment."). "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or to prevent manifest injustice." *Id.* (citing *Reich v. Hall Holding Co.*, 990 F. Supp. 955, 965 (N.D. Ohio 1998) (footnote omitted)). District courts are vested with "significant discretion" in resolving motions to reconsider interlocutory rulings. *Id.* at 959 n. 7.

Ragouzis does not claim that an intervening change of controlling law or the need to avoid a manifest injustice warrants reconsideration of the Court's February 10, 2026 Order. Instead, he argues that the Court should revisit his prior Motion for an Extension (Doc. # 58) and consider the supplemental evidence Ragouzis has tendered. (Doc. # 63 at 7). This evidence consists of a February 27, 2026 letter from Dr. James Thomson, treating physician for Ragouzis's counsel, Frederick H. Green. (Doc. # 63-4). Dr. Thomson's letter recounts, generally, the history of Mr. Green's spinal cord problems since April 23, 2025. (*Id.* at 1). Ragouzis argues that this letter constitutes "newly available evidence" demonstrating that Mr. Green was "experiencing significant pain that caused deficits in physical and mental function during the entire period from January 12, 2026 through February 13, 2026." (Doc. # 63 at 5). Indeed, Dr. Thomson's letter states that "[i]t was apparent in the course of the treatment of the lumbar spine that Mr. Green was in significant pain, which appeared to cause certain deficits in his ability to perform at his maximum ability, including physical and mental functions." (Doc. # 63-4 at 2). Ragouzis maintains that Mr. Green's physical pain prevented him from either filing a timely response to Hamilton's Motion for Summary Judgment (Doc. # 55) or moving for an extension prior to the January 20, 2026 deadline. (*Id.* at 5).

The Court's February 10, 2026 Order noted that Ragouzis failed to offer an explanation for his counsel's failure to seek an extension prior to the January 20, 2026 deadline. (Doc. # 60 at 7). Rather, Ragouzis's untimely request for an extension merely asserted that Mr. Green's surgery—scheduled for February 6, 2026—would have prevented the timely filing of a response to Hamilton's Motion for Summary Judgment (Doc. # 55). (*Id.*). This, however, did not explain why Ragouzis failed to move for an extension as required by the Court's Rules. (*Id.*). Although Ragouzis casts Dr. Thomson's letter as "newly discovered evidence," Ragouzis and his counsel were aware of the facts contained therein at least as far back as January 12, 2026. Despite this awareness, Ragouzis's February 3, 2026, Motion for an Extension did not argue that Mr. Green's physical incapacitation prevented him from seeking an extension. (*See* Doc. # 58 at 1). Thus, Ragouzis has failed to identify newly discovered evidence that would justify reconsideration of the Court's Order denying his request for an extension. *Browning v. Pennington*, No. 08-cv-88-KKC, 2011 WL 197859, at *3 (E.D. Ky. Jan. 20, 2011) (holding that movant failed to identify newly available evidence where he offered a declaration setting out facts of which the movant was previously aware).

But even if the Court were to consider Ragouzis's newly raised argument that Mr. Green's physical condition prevented him from timely seeking an extension, Ragouzis still fails to establish excusable neglect. Ragouzis argues that "during the entire period from January 12, 2026 through February 13, 2026" Mr. Green was experiencing significant pain that caused certain deficiencies in his performance as Ragouzis's counsel. (Doc. # 63 at 5). However, Ragouzis also acknowledges that during this same period, Mr. Green performed extensive work on this matter, including attending a teleconference with

13

opposing counsel and drafting a motion for extension and proposed order, although he "inadvertently failed to file these documents with the Court." (*Id.* at 2).  Thus, Mr. Green's failure to seek an extension was the result of inadvertence, rather than "extraordinary circumstances beyond his reasonable control." (*Id.* at 5).  This conclusion is underscored by the fact that, during the period of Mr. Green's alleged incapacitation, he prepared and filed multiple documents with the Court.  (*See* Docs. # 58 and 59).  And, as the Court emphasized in its Order denying his previous request for an extension, this was Ragouzis's second failure to timely respond to a dispositive motion.  (Doc. # 60 at 7-8).  In sum, Ragouzis has failed to set forth a sufficient reason to justify the extraordinary relief he requests.  Accordingly, Ragouzis's Motion for Leave (Doc. # 63) is **denied.**

### B.      Motion for Leave to File a Sur-Reply

In addition to his Motion for Leave to file a Response (Doc. # 63), Ragouzis has moved for leave to file a sur-reply "to address new arguments and factual assertions" allegedly raised in Hamilton's Reply in support of his Motion for Summary Judgment (Doc. # 62).

This Motion (Doc. # 64) flows from Ragouzis's decision to file an untimely Response three days after the Court's Order denying him leave to respond.  (*See* Doc. # 61).  Hamilton subsequently filed a Reply (Doc. # 62) "out of an abundance of caution after Plaintiff ignored the Court's earlier Memorandum Order." (Doc. # 66 at 1 n. 1).  In the wake of this Reply (Doc. # 62), Ragouzis moved for leave to file a sur-reply (Doc. # 64) and simultaneously filed a Sur-Reply (Doc. # 65) without leave.

Because Ragouzis's Response (Doc. # 61) and Sur-Reply (Doc. # 65) were filed without the Court's prior authorization and in violation of the Local Rules, both filings could

be stricken from the record.  *See Hollingsworth v. Mossotti*, No. 2:15-cv-1-WOB-JGW, 2015 WL 10488418, at \*4 n. 8 (E.D. Ky. Oct. 22, 2015); *Wilson v. Ibarra*, No. 5:22-cv-324-DCR, 2023 WL 3105056, at \*1 (E.D. Ky. Apr. 26, 2023) (striking a sur-reply filed without leave).  However, in the interests of expediency, the Court instead elects to give no weight to Ragouzis's Response (Doc. # 61) in ruling on Hamilton's Motion for Summary Judgment (Doc. # 55).  *See id.*  Nor will the Court consider any of the arguments made in Hamilton's precautionary Reply (Doc. # 62) or Ragouzis's unauthorized Sur-Reply (Doc. # 65).  Accordingly, Ragouzis's Motion for Leave to File a Sur-Reply (Doc. # 64) is **denied.**

## III.   HAMILTON'S MOTION FOR SUMMARY JUDGMENT

Having resolved Ragouzis's Motions for Leave (Docs. # 63 and 64), the Court now turns to Hamilton's Motion for Summary Judgment (Doc. # 55).

### A.   Standard of Review

Summary Judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.

A fact is "material" for purposes of a motion for summary judgment where proof of the fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d

15

171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If the party seeking summary judgment carries this burden, the non-moving party must point to evidence "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[.]" *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest merely upon the allegations or denials in his pleadings, but he must respond by setting forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). This requires that the nonmoving party "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir.

16

2009) (citing Fed. R. Civ. P. 56(e)(2)).  The Court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact."  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).  "The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion."  *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) (citation omitted).  "Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment."  *Alexander*, 576 F.3d at 558 (citing Fed. R. Civ. P. 56(e)).

## B.    Analysis

Ragouzis's Complaint (Doc. # 1) brings two causes of action—one for breach of contract and one for negligence—stemming from Hamilton's prior representation of Ragouzis in the Condominium Lawsuit.  These causes of action implicate questions about the scope of any representation agreement, the applicable duty of care, and Ragouzis's purported damages.  However, Hamilton's Motion for Summary Judgment makes a much narrower argument.  It asserts that both of Ragouzis's claims are barred because Ragouzis agreed to release any claim "either of an ethical or malpractice nature" that may have existed against Hamilton prior to January 11, 2024.  (Doc. # 55 at 10).  As a result, Hamilton argues that he is entitled to summary judgment on each claim.  (*Id.* at 2).

17

### 1.   Ohio Law Applies

At the outset, the Court must determine what law applies to Hamilton's Motion (Doc. # 55).  "As a federal court exercising diversity jurisdiction, the choice-of-law rules of the forum state, Kentucky, determine what substantive law to apply."  *State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 331 (6th Cir. 2017) (citation omitted).  And it is well-established that Kentucky applies § 188 of the *Restatement (Second) of Conflict of Laws* (1971) to resolve choice-of-law issues that arise in contract disputes.  *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 878 (Ky. 2013).  Under this approach, where an issue arises in contract, Kentucky courts apply the law of the state that bears "the most significant relationship to the transaction and the parties[.]" *Restatement (Second) Conflict of Laws* § 188(1) (1971).  In making this determination, courts should consider factors including the places of negotiating and contracting, the place of performance, the location of the contract's subject matter, and the domicile of the parties.  *Hodgkiss-Warrick*, 413 S.W.3d at 878-89 (citing *id.* § 188(2)).

Because the Release is a contract "subject to the rules of contract interpretation," the Court must determine which state—Ohio or Kentucky—bears the most significant relationship to the Release.  *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002); *see also Task v. National City Bank*, No. 65617, 1994 WL 43883, at *4 (Ohio Ct. App., Feb. 10, 1994) (holding that a release "is a contract between parties, enforceable at law subject to the rules governing the construction of contracts") (citing *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987)).

Considering the factors prescribed by the *Restatement (Second)*, as well as the totality of the circumstances, the Court concludes that Ohio bears the most significant

18

relationship to the Release.  As Hamilton acknowledges, "the vast majority of the events at issue occurred in Ohio."  (Doc. # 55 at 11 n. 4).  Indeed, Ragouzis and Hamilton negotiated the terms of the Release during the January 10, 2024 meeting at RKPT's office in Cincinnati.  (Doc. # 55-2 at 156:5-19; 159:23-160:25).  After Ragouzis orally agreed to the terms of the release, Hamilton insisted that Ragouzis meet with an uninvolved attorney to help prepare a written affidavit and advise him on the Release's effects.  (Doc. # 55-1 at 115:2-15).  Ragouzis then met with Bertha Helmick in Cincinnati the following day, and the two prepared the Release, which was notarized in Ohio.  (Doc. # 55-5 ¶¶ 21-25).  Further, although Hamilton is a resident of Campbell County, Kentucky, Ragouzis resides in Hamilton County, Ohio.  (Doc. # 1 ¶ 2).  The Release concerned claims that may have arisen during Hamilton's representation of Ragouzis in litigation taking place in Ohio courts.  (Doc. # 55-5, Ex. C-2).  And, in exchange for Ragouzis's release of these claims, Hamilton promised to refrain from immediately seeking withdrawal from the case, continue representing Ragouzis and the other Condominium Lawsuit Plaintiffs, and pursue last-ditch settlement negotiations with the Association.  (Doc. # 55-1 at 114:4-115:15).

Taking all of this together, Kentucky's only real connection with the Release is the fact that Hamilton resides here.  All the other factors suggest that Ohio bears the most significant relationship to the Release and, therefore, any issues concerning the Release should be resolved according to Ohio law.  However, as Hamilton observes in his Response, Ohio's law governing releases largely mirrors Kentucky's.  (Doc. # 55 at 11 n. 4).  Kentucky courts have likewise observed "little variance between Kentucky and Ohio law on [the general enforceability of releases.]"  *Ziegler v. Knock*, Nos. 2008-CA-002160-

19

MR, 2008-CA-002370-MR, 2013 WL 189793, at *2 (Ky. Ct. App. Jan. 18, 2013).  So, while the Court will apply Ohio law, an application of Kentucky law would likely lead to the same result.

### 2.    Ragouzis's Release Bars his Claims

Having concluded that Ohio law applies to the Release, the Court must determine whether the Release bars Ragouzis's negligence and breach of contract claims.

"A release is an absolute bar to a later action on any claim encompassed within it, absent a showing of fraud, duress, or other wrongful conduct in procuring it."  *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 465 (Ohio 2018); *see also Hank v. Great Lakes Constr. Co.*, 790 F.App'x 690, 695 (6th Cir. 2019) (quoting *Haller v. Borror Corp.*, 552 N.E.2d 207, 210 (1990)). "[W]hen a party signs and delivers a release, the party relinquishes all claims encompassed within it and has no other contractual or other duties to perform." *Id.* at 471.  Under Ohio law, broadly worded releases will bar claims that are waivable, even if such claims are not specifically identified.  *Hank*, 790 F.App'x at 696. Like all contracts, releases must be supported by consideration.  *Id.* (citing *Lake Land Emp't Grp. Of Akron, LLC v. Columber*, 804 N.E.2d 27, 32 (2004)).   Sufficient consideration entails a bargained-for exchange between parties involving "either a detriment to the promisee or a benefit to the promisor."  *Columber*, 804 N.E. 2d at 32. "Forbearance from exercising a legal right is sufficient consideration."  *Hank*, 790 F.App'x at 697 (citing *HomEq Servicing Corp. v. Schwamberger*, No. 07CA3146, 2008 WL 2151996, at *5 (Ohio Ct. App. May 20, 2008)).

"Generally, release is an affirmative defense that must be pled by the defendant[.]" *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1108 n.3 (6th Cir. 2010).  If a defendant

20

pleads release as an affirmative defense, and, in a motion for summary judgment, establishes the existence and applicability of the release, the plaintiff "may show the invalidity of the release, which can be done by showing mistake, incapacity, fraud, misrepresentation, unconscionability, or duress." *Id.* Where a plaintiff fails to respond with any argument or evidence that would raise a genuine dispute as to the enforceability of a release, summary judgment is appropriate. *See Corpus Juris Secundum* § 85 (noting that "the burden is on the plaintiff to plead any defenses rendering the release invalid once the defense is raised").

Hamilton has attached a copy of the Release to his Motion. (Doc. # 55-5, Ex. C-2). In the Release, Ragouzis avers as follows:

> 3. Having been appropriately counseled on the subject, I state unequivocally in this Affidavit that I have no claim against Rick Hamilton and/or any attorney in the firm of Robbins Kelly Patterson and Tucker through the date that I sign this document.
>
> 4. To the extent that any claim, either of an ethical or malpractice nature may have existed as of this date, I knowingly and voluntarily forever release any claim.

(*Id.*). The need for the Release, according to Hamilton, arose from Ragouzis's pattern of threatening behavior. (*Id.* at 7-9). As far back as July 2023, Ragouzis had been sending emails to Hamilton and other RKPT attorneys, accusing them of violating their duty to fairly represent Ragouzis. (*Id.* at 8). These threats escalated in January of 2024. (*Id.*). In an email to Hamilton, Schaengold, and Britt dated January 4, 2024, Ragouzis suggested that Hamilton was "in violation of the Ohio Civil Rules of Professional Ethical Conduct" and that he would "investigate further if this damn thing is not resolved soon." (Doc. # 55-3 at 725). Similarly, on January 9, 2024 Ragouzis sent an email to the same attorneys accusing Hamilton of "mislead[ing]" the Condominium Lawsuit plaintiffs. (*Id.* at

21

730).[5]  This conduct led Hamilton to the conclusion that he and his firm could not continue to ethically represent Ragouzis and the other Condominium Lawsuit plaintiffs "under the threat that Ragouzis would take some adverse action against them."  (Doc. # 55 at 8-9 (citing Doc. # 55-1 at 115:2-15)).  When Hamilton informed Ragouzis of his concerns at the January 10, 2024 meeting, Ragouzis refused to elaborate on what misconduct prompted his accusations.  (Doc. # 55-1 at 116:2-14).  Finally, Ragouzis stated that he didn't have any claims against Hamilton.  (*Id.*).  However, Hamilton urged Ragouzis to consult an uninvolved attorney to help him prepare a written release and advise him of its effect.  (Doc. # 55-2 at 162:13-23).  If Ragouzis took these steps, Hamilton agreed that he and his firm would not immediately move to withdraw and, instead, attempt to negotiate a settlement with the Association.  (Doc. # 55-1 115:16-22).  The next day, Ragouzis met with Bertha Helmick, who helped him prepare the Release, which Ragouzis signed.  (Doc. # 55-2 at 161:15-23).

Viewing the record in a light most favorable to Ragouzis, Hamilton has established the existence of a Release which plainly forecloses the two causes of action Ragouzis raises in this matter.  This Release is supported by adequate consideration.  Hamilton made clear that, given Ragouzis's repeated threats, he could only continue in his capacity as Ragouzis's attorney if Ragouzis agreed to release these claims.  Ragouzis had a legal right to bring such claims just as Hamilton had the legal right to move to withdraw as

---

[5]    Ragouzis's threatening emails continued even after Hamilton and RKPT's eventual withdrawal as counsel.  On February 29, 2024, Ragouzis sent an email to another attorney at RKPT, in which he stated:  "You let cue ball fuck up the firm.  I'm coming after you.  Get the checkbook out.  If you refuse to reimburse me I will sue your firm for at least the value of the Madison house.  Your firm is nothing more than a bunch of ymca lawyers."  (Doc. # 55-3 at 794).

counsel.[6]  *See* Hamilton County L.R. 10(D) (attorneys may apply for leave to withdraw as an attorney in a civil case); *Hank*, 790 F.App'x at 697 n.3 ("Promising not to bring a colorable legal claim is sufficient consideration.") (citing *Coate v. Hartley*, 52 N.E.2d 672, 674 (Ohio Ct. App. 1943)).  By agreeing to abstain from taking action within their legal rights, both Ragouzis and Hamilton incurred a detriment.  Simultaneously, each party to the Release received a benefit—Ragouzis received Hamilton's continued service as his attorney and Hamilton received the peace of mind that came with Ragouzis's waiver of threatened malpractice claims.

A release of claims must not be the result of "fraud, duress, or other wrongful conduct[.]"  *Lucarell*, 97 N.E.3d at 465.  Where a defendant establishes the existence of an applicable release, the plaintiff bears the burden of proving that the release is unenforceable.  *Wysocki*, 607 F.3d at 1108 n.3; *see also Blodgett*, 551 N.E.2d at 246 (holding that a person claiming that he or she was the victim of duress bears the burden of proving that such duress existed).  As discussed above, Ragouzis failed to respond to Hamilton's Motion (Doc. # 55).  Thus, he has failed to offer any evidence that the Release is unenforceable.  However, Ragouzis has previously argued that, although the Release would bar his claims, it "is invalid, as it was obtained under undue influence and pressure" and "secured under duress[.]"  (Doc. # 26 at 10).  Hamilton addresses these arguments in his Motion, and, in the interest of completeness, the Court will consider them.  (Doc. # 55 at 16).

---

[6]    Hamilton and RKPT eventually moved to withdraw from the Condominium Lawsuit after settlement negotiations broke down and the Condominium Lawsuit Plaintiffs splintered in their desire to continue litigating.  The court granted this motion and, at the hearing, noted that "no attorney should have to continue representation if they are being threatened by their client.  It is not possible."  (Doc. # 55-3 at 771).

In his Motion, Hamilton suggests that the appropriate test to determine whether a release was knowing and voluntary comes from the Sixth Circuit's opinion in *Adams v. Philip Morris, Inc.*, 67 F.3d 580 (6th Cir. 1995).  (Doc. # 55 at 12).  However, in *Adams*, the Sixth Circuit provided a test to determine "whether an employee's waiver of their rights" under the ADEA and Title VII of the Civil Rights Act was knowing and voluntary. *Moore v. Coca-Cola Bottling Co.*, 113 F.4th 608, 618 (6th Cir. 2024).  An employee's release of such claims, then, presents "a question of federal common law[.]"  *Id.* (citing *McClellan v. Midwest Mach., Inc.*, 900 F.3d 297, 302-03 (6th Cir. 2018)).  Where, as here, the Court is not faced with an alleged release of federal claims, the Court must apply the contract rules of the appropriate state—Ohio, in this case.  Although the *Adams* test does not supply the exact rubric for evaluating whether Ragouzis's Release was the result of improper influence, many of the considerations it urges remain relevant.  *See Adams*, 67 F.3d at 583 (noting that the *Adams* factors reflect "ordinary contract principles").

Under Ohio law, duress exists where "(1) one side involuntarily accepted the terms of another; (2) circumstances permitted no other alternative; and (3) the circumstances were the result of the other party's coercive acts (not a result of the alleged necessities of the duress claimant)."  *Carpenter v. Davison*, 2023-Ohio-2284, ¶ 33 (7th Dist.) (quoting *Blodgett*, 551 N.E.2d at 1251)).  The concept of duress encompasses "'economic duress' as well as physical compulsion."  *Blodgett*, 551 N.E.2d at 1251.  "A person who claims to have been a victim of economic duress must show that he or she was subjected to 'a wrongful or unlawful act or threat,' and that it 'deprived the victim of his unfettered will.'"  *Id.* (quoting 13 WILLISTON ON CONTRACTS (3d Ed. 1970) 704, Section 1617 (cleaned up)).  "The real and ultimate fact to be determined" when a party to a contract claims duress "is

24

whether the party affected really had a choice; whether he had his freedom of exercising his will." *Tallmadge v. Robinson*, 109 N.E.2d 496, 500 (Ohio 1952).

The record before the Court contains no evidence that the Release is the product of duress. As discussed above, Hamilton and RKPT had the right to seek withdrawal as counsel in the Condominium Lawsuit. Similarly, Hamilton had a right to request that Ragouzis abide by his agreement to pay for legal services rendered. The Hamilton County Court of Common Pleas recognized this when it ultimately granted Hamilton's motion to withdraw after settlement negotiations proved unfruitful. (Doc. # 55-3 at 771-72). Importantly, Hamilton had a right to request a release from Ragouzis in the face of his repeated threats—some more veiled than others—to file suit. "It is not generally a wrongful or unlawful act if the defendant threatens to do something that [he] is legally entitled to do." *Hank*, 790 F. App'x at 698 (quotation omitted). Conversely, Ragouzis had the right to reject Hamilton's request to release his claims, allow Hamilton to withdraw, and file a malpractice action against him. Thus, when he elected to release his claims against Hamilton and RKPT, Ragouzis had multiple reasonable alternative courses of action. This fact precludes a finding that he agreed to the Release under duress. *See Hilb, Rogal & Hamilton Agency of Dayton, Inc. v. Reynolds*, 610 N.E.2d 1102, 1107 (Ohio Ct. App. 1992) (holding that a threat to withhold services will not amount to duress if the victim can procure a reasonable alternative).

Further, Hamilton's actions do not reflect an intention to coerce Ragouzis into signing the Release against his will. As Ragouzis acknowledges, Hamilton urged him to seek the counsel of an independent attorney prior to executing the Release. (Doc. # 55-2 at 162:22-23). And Hamilton gave Ragouzis a full day to seek out such advice. (Doc.

25

# 55-5 ¶ 20); *see Graves v. Mental Health Mgmt., Inc.*, No. 59668, 1991 WL 271436, at *3 (Ohio Ct. App. Dec. 19, 1991) ("Even assuming the employee had less that [sic] twenty-four hours to decide whether to sign the release, we do not find this supports his duress defense."). Based on this evidence, no reasonable juror could conclude that Ragouzis was under duress sufficient to render the Release unenforceable.

Relatedly, to establish that a release was the result of undue influence, a plaintiff must show that (1) they were susceptible to influence; (2) another party had the opportunity to influence them; (3) the other party attempted to, or actually did, exert an improper influence; and (4) a result occurred showing the effect of improper influence. *Carpenter*, 2023-Ohio-2284, ¶ 34 (citations omitted). This conduct "must so overpower and subjugate the mind of the [person said to be unduly influenced] as to destroy his free agency and make him express the will of another rather than his own, and the mere presence of influence is not sufficient." *West v. Henry*, 184 N.E.2d 200, 202 (Ohio 1962).

By Ragouzis's own admission, Hamilton insisted that, prior to drafting and signing the Release, Ragouzis consult an uninvolved attorney. (Doc. # 55-2 at 162:13-18). Ragouzis testified that Hamilton made this request because "he wanted [Ragouzis] to be advised as to what the meaning of the affidavit, the release meant." (*Id.* at 162:21-23). Although Ragouzis could have found an independent attorney, he chose to consult Bertha Helmick, one of his co-Plaintiffs, instead. (*Id.* at 162:24-163:5). And when Helmick refused to advise Ragouzis on the Release, he could have requested additional time to contact an attorney that would advise him. Instead, Ragouzis chose to sign the Release, swearing that he had "been appropriately counseled on the subject" and that he "knowingly and voluntarily" released his claims. (Doc. # 55-5, Ex. C-2). He then delivered

26

the Release to RKPT by email and directed them to "GET THE SETTLEMENT DONE." (Doc. # 55-3 at 738 (emphasis in original)).   There is no evidence that would allow a reasonable juror to conclude that Hamilton's actions "so overpower[ed] and subjugate[d]" Ragouzis as to "destroy his free agency[.]"   *West*, 178 Ohio St. at 501; *see also Jones v. U-Haul Co. of Massachusetts and Ohio, Inc.*, 16 F. Supp.3d 922, 938 (S.D. Ohio 2014) (employer's demand that employee accept arbitration agreement as a condition of continued employment did not constitute undue influence).

## IV.   CONCLUSION

Because Hamilton has sufficiently established the existence of a valid release that precludes Ragouzis's claims, he is entitled to judgment as a matter of law.   Accordingly, for the reasons stated herein,

**IT ORDERED** as follows:

(1)   Plaintiff Edgar T. Ragouzis's Motion for Leave to File a Memorandum in Opposition to Defendant's Reply in Support of His Motion for Summary Judgment (Doc. # 63) is **DENIED**;

(2)   Ragouzis's Motion for Leave to File Sur-Reply to Defendant's Reply in Support of His Motion for Summary Judgment (Doc. # 64) is **DENIED**;

(3)   Defendant Richard O. Hamilton's Motion for Summary Judgment (Doc. # 55) is **GRANTED**;

(4)   Ragouzis's Complaint (Doc. # 1) is **DISMISSED WITH PREJUDICE**; and

(5)   **JUDGMENT** in favor of Hamilton shall be filed contemporaneously herewith.

This 16th day of April, 2026.



Signed By:

*David L. Bunning*   *DB*

**Chief United States District Judge**

G:\Judge-DLB\DATA\ORDERS\Cov2024\24-94 MOO re MSJ.docx